The Honorable, the judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you, Madam Clerk. I want to welcome the lawyers to the 4th Circuit today. I'm sorry we're not with you personally in Richmond, but this is the best we're going to be able to do for this proceeding. Now, Mr. Davis? Yes, sir. You're here for Juanita Britt. Yes, sir, that's correct. And this is case number 19-2177, Britt v. Saul. And Mr. Davis, we're pleased to hear from you, sir. Thank you. Your Honor, as you said, my name is William Davis, and I'm a member of the Robson County, North Carolina Bar. And I represent Mrs. Britt. Mrs. Britt applied for disability, alleging several things that was wrong with her. In the hearing before the ALJ, she testified that she, as far as work is concerned, she performed several jobs with different employers, performing food, preparing food, decorating cakes and washing dishes, and that some of these jobs required her to be on her feet all day, may lift up to 100 pounds in some cases. And she also testified that she had surgery on her right foot for bone spurs and drop arches, which were formed by Dr. Ricotta. And recently, I think it was 2016, her doctor advised her that she needed surgery on both of her feet. But she has not been able to get that done because she doesn't have any medical insurance. Now, in her testimony, she indicated that she cannot stand on her feet for more than an hour, and she's in constant pain even standing on her feet. She can sit for about an hour, and that when she was working, that her employer allowed her to sit or stand up. But for a while after that didn't work out, he told her that because of her problems, she was slowing down to work, and I think she wasn't able to do the work. As far as some of her functions, she can only walk for short distances, and she has to stop and she has to sit because of the pain. And she has pain in her hands and her wrists, which affects her ability to lift things. And because of that, over a period of time, her doctor prescribed a different set of devices to help her with her walking and her pain. You take the pressure off her feet and ankles, and even with those devices, it did not relieve the pain in her feet. And because of the pain, constant pain, she has to lay down and elevate her feet for one to two hours to get relief. And for her reflux, she's on medication. She has to take a laxative to use the bathroom, and the side effects from medication cause her to have diarrhea. She had pain dealing with acid reflux, and the pains are sharp and they last for an hour. She recently started receiving counseling for her mental impairment She was diagnosed with depression, anxiety, pre-immune behavior, panic. And over the time, the doctors increased their medication because it wasn't sufficient. After hearing the ALJ post two hypotheticals to the location expert, the expert found that she couldn't do her past work, which was fast food work, which was light work, and she worked as a cook or helper, which was medium work. And she found that she couldn't do that work, but they found that she could do work at the light level and dealing with several other jobs that he identified in the record. And he proposed, like I said, he proposed two hypotheticals to her. And in spite of her limitations, the ALJ found that she could do other jobs. Now, in evaluating her claim, both the ALJ and the district court used the five-step evaluation process set forth in the regulations. And he found that she had not engaged in gangplank employment and that she had several impairments dealing with irritable bowel syndrome, bone spurs, bilateral plateau, and a major depressive disorder. And in spite of the fact that there was substantial evidence, medical evidence, diagnosing her with chronic pain, active reflux disease, the ALJ found that these were not severe impairments and found them to be non-severe. And the pain, which all of her doctors diagnosed and elaborated on based on their clinical testing, he found that she was being treated at a pain clinic. Therefore, he found that the pain was not a severe impairment. And for the active reflux, he found that was severe because she was taking medication. Step three, he found that her physical impairments, the muscular impairments, did not meet an equal list because it did not cause her to be able to ameliorate effectively. In other words, he found that she was able to walk without any device. And this finding is contrary to the medical evidence from her treating physicians over the last, I guess, beginning in 2011 up to 2016, 2018. All of them basically diagnosed her with having pain. Mr. Davis, this is Judge King. Is it your position that she can't walk? Is that what you're saying? She has difficulty walking. She has, she's in pain if she does walk. She's in pain if she walks. How old is she, Mr. Davis? Yes, I think she's in her, she's classified as, she's in her mid-20s. She's classified as a young individual because of her age. I forgot. I had it in front of me. But she, she had been, I think she was 46 somewhere along about the time she started. And over time she, when she started or 46 now, which is, what are you saying, how old is she? Oh, she was 46 at the time of the hearing, but I don't have that. Sir, that was in, you hear it was in 2017 when they had the interview. Yes, sir. And like I said, this pain, on a scale, based on the clinical testing of her doctors, because of the, I guess. What did the ALJ do wrong? What did the ALJ do wrong? What did the court do wrong? Well, for dealing with her, first of all, it's step two. For determining her severe impairments, impairments. He did not properly evaluate and weigh the medical evidence for her treating an examined physician. He did not even mention their diagnosis, their opinions and things in making his decision. Not only medical evidence, evidence that he appeared to weigh based on his decision, was that from the state agency, which was a non-examining person. And he gave that particular examination review limited weight. He didn't list any weight or mention or give or assign any weight to any of her doctors that she had been seeing since 2011. Even though their medical evidence is substantial based on the record. And she had about four or five different treated and examined physicians beginning, like I said, since 2011. See, none of that was for trying to determine her impairments and her residual functional capacity. None of those, or none of her physicians' opinions were assigned any weight. In fact, I don't think he mentioned them whenever he was trying to determine her. The he here is the ALJ? Yes, sir. The ALJ. Yes, sir. He just disregarded all of her medical evidence and he didn't give any reason as to why. And like I said, the only evidence he appeared to evaluate in making his decision was that from the state agency. And that was a non-examining physician. And he gave that evidence a little weight. And she had substantial medical evidence from her treated and examined physician over the years, going through the date of her hearing and after. And he didn't, other than mentioning them, he didn't either weigh or evaluate that. And their opinion is based on an extensive treatment relationship over, say, from 2011 to 2018 up to the date of the hearing. And like I said, most of her symptoms dealt with her feet. She had bone spares. She had tendinitis. She had several symptoms dealing with her feet. And that's why the doctor prescribed several devices to help her to walk. And she got so bad, Your Honor, for the pain, he prescribed that she wear a boot even when she was 24-7, even when she was asleep. She had to wear a boot on her foot to help decrease the pain because the pain was getting worse over a period of time. And in his report, he indicated that she was not able to work because of that. She had to wear a boot 24-7 in order to deal with the pain. And that affects her ability to deal with her mental impairments. She had, like I said, she had anxiety. She had depression, chronic depression. And she was diagnosed by her doctors with post-traumatic stress syndrome. She had a problem with what they called DMS-5. And like I said, the post-traumatic stress disorder was diagnosed in 2016. And he increased her medication because of that. And for the foot and ankle clinic, she was diagnosed with pain. And she had a left Achilles tendinitis in both feet. And all of these diagnoses for the tendinitis, the bone spurs, Achilles tendon, that's basically consistent with all her medical evidence since 2011. Almost all the doctors that she went to see and that who examined her, they mentioned pain and it contributed to Achilles tendon, bone spurs, and things like that. And she even had surgery, I think it was 2014, on her foot to help resolve the problem, but that didn't do it. And there was a, he recommended she have additional surgery, but she couldn't because she didn't have an American insurance to receive this type of treatment or surgery. So she's limited mentally because of depressed moods and her depression caused her to be fatigued. She socially withdraws and she also lacks the ability to concentrate. She has crying spells and she has, and one of the doctors said that she met the criteria, Dr. Locklear, for post-traumatic stress syndrome. And like I said, there's about half a dozen treated and examined physicians who basically came up with the same physical disability. The premier behavioral clinic was primarily treated her for her mental impairments that dealt with her depression and post-traumatic stress syndrome and things like that. And she had crying spells, which affected her. Mr. Davis, you're running out of time. You saved some rebuttal time. Do you want to continue to save that rebuttal time? Yes, sir. All right. Why don't we hear from the council for the Social Security Administration? Is that all right? Yes, sir. All right. Ms. Quick. Are you there? Yes, I'm here. Good to have you with us, Ms. Quick. Thank you. My name is Jillian Quick and I represent the Commissioner of Social Security. Your Honors, substantial evidence, as we were reminded in Bistec-Berry Hill, is not a high burden, is not a high standard. It is ultimately the plaintiff's burden of proving that she's disabled. And as long as there is sufficient evidence that a reasonable mind might accept as adequate to support a conclusion, then it should be upheld. Here, there is substantial evidence that that bar is met exceedingly. This was a 39-year-old woman at the time of her application, at the time that she purportedly became disabled, and she was 42 years old at the time of the ALJ's decision. She purported that she was disabled because of foot impairments, including plantar fasciitis and bone spurs, as well as irritable bowel syndrome that caused constipation. Those were her main complaints. But with respect to her foot, she testified that she wore her shoes tight to put pressure on her feet. That's on pages 89 to 90. With respect to constipation, she took Ex-Lax periodically, and that's on page 77. She reported to a provider on page 733 that she had a fair treatment response using Ex-Lax and that the medication was adequate. She admitted at the hearing that she was able to stand for one hour, and she could sit for as little as 30 minutes and stand again, despite her pain, and that that would relieve her foot pain. And that's on pages 76, as well as pages 65 to 66. The ALJ limited her to jobs that allowed her to sit or stand as she needed. And that's in his decision on pages 46 to 47. The vocational expert testified that as long as she could remain in either position for at least 30 minutes, she could do the jobs that the vocational expert identified. And that's on pages 95 to 96. Further providing additional substantial evidence in support of the ALJ's decision is that the record shows that she did not need an assistive device to walk. Like, she did not need a cane, for example. She had a normal gait. Were these jobs close to where she lived? Your Honor, the requirement under the regulations is that the jobs exist in a significant number in the national or regional economy. So there is no requirement that they be within any particular commuting distance. You didn't answer my question, though. Okay. Your Honor, I do not believe the vocational expert testified as to the distance from her home. Okay. So she lives where? Do you know where she lives? Oh, I believe I did see that. She lives. And where were the jobs that she was supposed to get? In Lumberton, North Carolina. That's where she lives? Yes. That's where she lives? That's her address on the ALJ's decision on page 39. Okay. And where is she supposed to get these jobs? Okay. The various jobs included hospital product assembler, inspector. Where are they? Well. They're in the national economy somewhere. That's what you said? That's correct. The vocational expert testified. Was she supposed to get them in Charlotte or Raleigh or someplace like that? Your Honor, I am not familiar with the jobs that are available in her specific case. You're the one that brought it up. You're the one that brought it up. Sure, Your Honor. You said that the expert said she could find a job. Yes. The ALJ asked the vocational expert to specify jobs that would be available. Right. Available. The jobs are supposed to be available. There you go. There's a word. Available. Yes, Your Honor. All right. If it's available 100 miles from where she lives, is it really available? Okay. Your Honor, that is not the standard, and I believe that's in pass. Well, I'm not asking you for the standard. I'm asking you if it's available in Raleigh, North Carolina, for example. That's about 100 miles maybe from Lumberton. Well, is it available to this lady? Your Honor. Is it your position it's available to her? Is it the Social Security Administrator's position it's available to her? Your Honor, step five. You're here representing the government, and you're telling us that she's got jobs available. Yes, Your Honor. That she can do. All right. Yes. Yes, Your Honor. This is a young individual who is limited to light work that allows for a sit-stand option, and the vocational expert testified that these are jobs that are available in significant numbers in the national economy, and that is all that the regulations require. Okay. It's like, for example, we don't consider your ability to get to work. We don't, you know, if you have a limitation that you do not have a vehicle, for example, the commissioner does not consider that. Which makes no sense when you use the word available connected to it. Well, you're, okay. They're available, but you don't consider whether they, the transportation. You don't consider how far it is. It's available in the national economy. So in your view, in your client's view, it could be available in Atlanta or Cleveland or somewhere, and this lady wouldn't be entitled to benefits because it's available. I mean, I'm not arguing that that's what the regulations say, but that doesn't make a lot of sense. Right. I mean, the standard is just that the work exists in the national economy. The standard is national economy. Yes. But the word available undercuts it. It's, Your Honor. Available to me means it's something she could get to and do. Okay. And you're telling us that's not the government's position as to what availability means. It's available, but it's not available. Your Honor, that is the standard, and it's maybe available is the wrong word for me to have used. Perhaps it's just whether it exists. Available is available. You said that was the testimony of this fellow that was the expert. I think you were referring to the expert. Yes. You were quoting the expert. I'm not blaming you. You were quoting the expert. He said it's available. Well. As far as he's concerned, it's available in the national economy because that's what the regulations authorize him to say. Your Honor, and I misspoke when I said that he said the vocational expert used the word available. Like the regulations, if that's what it says. Right. The words in the regulations are that it exists in significant numbers in the national economy. Okay. They don't have to be available. They just have to exist, then. That's what your testimony is now or your response is now? Yes, Your Honor. Okay. Your Honor, I hope I am answering all the questions, but if you need me to brief this further, because I don't believe we had an opportunity to address this particular issue, so I would be happy to provide something further. And, you know, where I'm looking at is Section 404.1566. We consider work that exists in the national economy when it exists in significant numbers, either in the region where you live or in several other regions of the country. You said region where she lives. So there you go. And then it says it does not matter whether, one, work exists in the immediate area in which you live, two, a specific job vacancy exists for you, or three, you would be hired if you applied for work. Well, if she would be hired if she applied for work, it would imply at least that it's something available to her that she could get to. If she lives in Lumberton, North Carolina, it would be something in the area around Lumberton that she could get to, get in an automobile and drive to. It seems to me under that, I think it's the third alternative you gave us. Okay, that it doesn't matter. It's saying it does not matter if you would actually be hired if you applied. So this is the standard for determining whether someone is disabled or not. It is not an actual exercise in providing them a job, for example, or ensuring that they would be able to get to the job. It is only to determine are there some jobs that do exist in the national economy that a person with the claimant's limitations could perform. And in this case, the plaintiff was a younger individual, and younger individuals have more jobs typically available to them, especially in this case where she could perform light work that allowed a sit-stand option. And she's younger than most of the applicants for disability benefits. That's fair to say, isn't it? Yes, Your Honor. Most of them probably in the 50s and 60s or so. Right, or, yeah, right. Is she, something I didn't, is she overweight on this record? Is that something that's behind some of this? I didn't hear Mr. Davis. I don't think she was diagnosed with obesity. I am actually trying to figure out her weight right now, but. Okay. Okay. Right. That comes up in these types of cases sometimes with us. We hear about these cases. We're not complete novices on this stuff. Right. She did self-report her weight as 170 pounds. I'm looking at page 109. So, and 64 inches. Counsel, can I ask a slightly different question just to make sure that I understand? And I'm particularly sort of asking about the concentration, persistence, and pace finding where the district court indicated that there was a mild impairment. And I'm just trying to make sure I understand what is meant by mild. And this is not a trick question. So if you don't know, just say you don't know. But if I look at 404-1520A, it describes a five-point scale, sort of severity of illness scale of non-mild, moderate, and moderate to the limit market extreme for CPP diagnosis. Am I looking in the right place to understand that? And then if so, can you point me to anywhere where there's an explanation of what those five stages mean? Sure. Sure, your honor. Okay. Yes, the district court did discuss the mild limitation and concentration, persistence, or pace on page 13, I believe, of the decision. Okay. Yes. Yes. 4-4-15-20-A specifies the different levels, none to extreme. But mild is actually defined in, like, the listing, listing 12.00-F-2. And it says, you're functioning in this area, it says mild limitation. You're functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited. By contrast, moderate limitation means you're functioning in this area independently, appropriately, effectively, and on a sustained basis is fair. If a person has no limitation in the four broad functional areas or only mild, that would actually demonstrate a non-severe impairment. A severe impairment requires at least one moderate. Here she did have a moderate limitation in her social functioning, but not in concentration, persistence, or pace, which is what the district court found distinguished it from Mascio. And her main problem, she did describe, was dealing with other people. And that's on page 668 where she said that was her main source of stress, was other people. And the ALJ then limited her to only occasional interaction with others. And, Your Honors, she did not allege a mental impairment in her application. She didn't require any mental health treatment for two years after her alleged onset date. And the ALJ recognized that she initiated treatment towards the end of the relevant period and appropriately evaluated the records that showed prior to that time that she had an appropriate mood and effect, adequate judgment and insight. And then at her initial examination before she was on medication in August 2016, she had some difficulty spelling world backward and recalling some items after five minutes. However, treatment notes thereafter in October and November showed that she had logical thought processes and she had goal-directed speech. And that's on pages 684 and 670. The ALJ limited her to simple routine tasks, even though there weren't any restrictions given to her by a treating provider. I have one question, if I could, Ms. Quick. With regard to the evidence of sit-stand, did the ALJ's finding on RFC, the residual functional capacity, was it adequately reflected in the hypothetical? It seems to me there were differences in terms of what the hypothetical said and what the RFC said in the ALJ's finding. So how do we deal with that in analyzing this case? Okay, Your Honor. I am out of time. Is that okay that I respond? You go right ahead. If you've got questions, you go ahead and answer them. Thank you very much. Okay. You answer Judge Keenan's question the best you can. All right. Thank you so much. Okay. In the RFC, it says sitting or standing as desired, such as in bench work occupations, and that's on page 46. Didn't sit-stand as needed someplace? Okay. And then I'm not sure where the discrepancy is. I'm trying to quickly look right now. I apologize. No, that's okay. It's just that it was more specific in the hypothetical. Okay. Okay. Let me see. It was in the RFC. And my question is just, I don't know the answer. I'm asking you. Okay. The problem here because of that. Okay. I see on page 95, it says the individual would be able to perform the jobs either sitting or standing as desired, such as in bench work occupations. I believe that is, it says as desired, and then the RFC says also as desired, such as in bench work occupations. So pages 46 and 95 look identical, and it is consistent with her testimony where she testified that she could stand. Can I follow up on that just for a second? I don't want to hijack Judge Keenan's question, but I thought in the hypothetical, the question was asked whether she could stand or sit for at least a half hour at a time. And that seems different from saying sit or stand as needed. Because that would imply that you have, you have a choice at every moment, whether to sit or stand. Your honor. Okay. The ALJ did ask about sitting and standing as desired. And then the vocational experts said, as long, and this is on pages 95 and it continues on to 96. It says, I do find that these jobs, someone does need to be able to maintain a position for approximately 30 minutes in order to stay productive on the job. So then the ALJ said, I believe she testified. She could stand for about an hour and then would have to sit for about a half an hour. And then the vocational expert continued to describe the jobs. So when it's, so the ALJ's question was this was as needed. And then the VE clarified that she would need to sit for 30 or stay, you know, stay in one position for at least 30 minutes and the plaintiff testified that she could do that, that she would be able to stand for an hour and sit for 30 minutes and then resume standing. And that was on pages 76. And I believe it was earlier in her testimony as well on pages 65 to 66. She testified that she actually had tried to do that in her prior occupation, but it did, but she said that it slowed her down too much. However, here the vocational expert identified jobs where she would be able to be productive. They are different jobs, ones that she would be able to be productive at as long as she could just stay in either position for at least 30 minutes. So the 30 minutes was used as the equivalent of, as needed in that discussion. Right? Yes, your honor. That's correct. Because that seems to be, that seems to be probably inappropriate in context to judge Richardson's question. Your honor. She testified that that was how she needed to stand and sit. She testified that in her prior job that she did try to, to do this exact kind of sitting and standing and that her employer did allow her to do it. But in that type of job, she wasn't able to be productive because it was not a bench work kind of job. Like the vocational expert was able to identify and the vocational expert was able to identify what kind of work was needed. What kind of surgery was that she needed? What was the surgery that she needed? A couple of doctors did some surgery. Right. Her ultimate surgery that she ended up getting after the ALJs decision was for plantar fasciitis and tendonitis. Is that what she was, was that she needed, there was some, some surgery that she needed a couple of times and they didn't, she didn't have enough insurance, didn't have insurance to cover it. So she didn't get it. Right. That is, it seems the procedure that she needed that, and she ended up getting it after it was a year, almost a year after the ALJs decision. Is that in the record then? Yes. Yes, it is. It's on page. Well, how does it get into record if it's after the ALJs decision? She submitted it to the appeals. Your Honor, I didn't mean to interrupt. She submitted it to the appeals council. So it's. Okay. There's evidence of it. Prior to the surgeries on pages about 18 and 23, 34, and then post-op, there's a treatment note that was submitted. It's page 25. But Your Honor, the ALJ did account for her foot impairment, although she was not able to get the surgery that was recommended. She was not taking regular pain medication. Her only medication was Exlax. She was not taking anything else. And she testified that she just wore her shoes tight to relieve the pressure. At some point there, she was taking Tamarol. Right. Somebody had her taking a dosage of Tamarol. That's a pain medication. She, there was a time that she took some pain medication, Your Honor. And I'm not sure that was even during the relevant period. But as of the time of the hearing, and in other treatment notes from 2016, she was not taking anything. And the ALJ, and she said she could stand up. Did she get cut off from her medications because she didn't have any insurance? Your Honor, she wasn't even taking a leave. And this is a woman, this is not a woman who is only getting treatment from a free clinic. She did actually see specialized providers, a variety of specialized providers. This is not a person who is going to the ER frequently because of pain. And she doesn't even have any restrictions given to her by any of her providers. She did testify she would be able to stand, despite her foot pain. She could stand and then she would be able to sit to alleviate the foot pain and then she could stand again. Is that all you have? We've given you some extra time. We appreciate it. Thank you. Let's judge Richardson or judge Keenan have something else they want to add as well. No, thanks. Very good. Thank you, Ms. Quick. We appreciate it. Mr. Davis. Okay. Yes. Can you hear me now? Give us your rebuttal. Okay. Yeah. Okay. We think the evidence is not supportive of the decision, both because it's not substantial and because of legal areas. Like I said, in making the determining impairments and RFC, the ALJ did not properly weigh and evaluate the medical evidence from her treating physician. The only evidence he used in making his decision that I can determine, there wasn't any, because he sent a little weight to the evidence from the agency. Now that's important because he didn't use the function by function to determine the limitations and restrictions on her ability to walk, stand, sit, He didn't do any of that analysis that's required by that. And that's one of the basic rules under the, under the other rules. And the, the cases all said that he's required to make a detailed discussion and finance on each of his inclusion, dealing with the, how the restrictions and limitation affect ability to walk, stand, sit, and push and pull. And he didn't do any of that discussion. And the, the judge said that was harmless error, both for that. And for the, the error that the ALJ made in not weighing her medical evidence when treating and examining physicians. And those are without those two, that there's nothing else or no other evidence that he can base his decision on. He just basically looking at a record, you cannot tell what way he signed or what, because he's on the weight way, the agency decision, he signed a little weight. Now before his, the function by function analysis, you know, that is the test because you have to use that and determine RFC, the function capacity, what she can do or can't do. And that was not done. And so that's important based on Monroe that for this court to determine whether or not you can make a meaningful review of the decision. And I'm contending that the court cannot, because this is a function by function test was not used in this case. Now was the, the proper standards use and when I signed it and evaluating their treating physician evidence. And that is the case. He didn't use it in determining her RFC function capacity. Nor did he use those limitation restriction in hypotheticals that he proposed to the vocation expert. So without all the evidence being considered in a way and, and proposed to the VE evidence is insufficient and not substantial. And it's based on arrow. And that's my contention. So even the LJ, I mean, The vocation expert said that if she missed more than 10%, she'd be disabled. And based on her testimony that she, sometimes she may miss days out of work because of the pain. And most of her pain, doctors rated her pain on a scale of eight out of 10. And she had the word advices to walk, even to sleep to help resolve her pain or leave her pain. And it didn't do it completely. So even as she was able to spend, She was still in pain. Like she said, in constant pain, she said, I can stand. But, and she said she could walk, but she's in constant pain. And that pain would affect her ability to concentrate. New things. And they all said that she had problems or the depression and being around other people. And that's what she testified to. You hear that bell. Yes, sir. I'm sorry. So I'm finished. I don't think they have any support. Go ahead. I'll give you another 30 seconds to say something. Finish up there. Make sure you heard the bell. I heard the bell. Go ahead. Yeah. I heard. Like I'm saying in summation, because the, he made an error with the chief physician and examined physician and not weighing that and not doing a function by function analysis of her restrictions. The case cannot be self-taught to be supported by substance. And thank you, judge. Thank you, Mr. Davis. We appreciate it. And we'll take your case under advisement. Now, if we were in Richmond, few lawyers can still hear me. If we were in Richmond here in this case, we'd leave the bench, the three judges now. And we'd come down to the well of the court and greet you. And we'd individually tell you that we appreciate your arguments and thank you for your work. But we're not in Richmond. We can't do that. We'll just have to, you'll have to accept this as the best we can do. Maybe next year. Madam clerk. We'll take this case under advisement and you can call the next case.
judges: Robert B. King, Barbara Milano Keenan, Julius N. Richardson